In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00238-CV**
_____

**IN THE INTEREST OF Z.G.**

**On Appeal from the 279th District Court**
**Jefferson County, Texas**
**Trial Cause No. F-221,807**

**MEMORANDUM OPINION**

The trial court terminated appellant A.A.'s parental rights to Z.G. In this accelerated appeal, A.A. presents four issues challenging the legal and factual sufficiency of the evidence. We affirm the trial court's judgment terminating A.A.'s parental rights to Z.G.

BACKGROUND

The case was tried to the bench. Detective Dennis Collins of the Beaumont Police Department testified that when he was working as a security guard at the apartment complex where A.A. resides, he saw A.A. coming out onto the balcony

1

screaming while holding Z.G. Collins described A.A. as "pretty irate and upset" and indicated that she was "just crying and mad, screaming and hollering." Collins explained that as he got out of his car, A.A. reentered her second-floor apartment and eventually reemerged onto the balcony with Z.G. According to Collins, A.A. "was screaming saying that she'd given up on her and her son and she was very upset and hollering." Collins testified that A.A. was out of control of herself, and that he feared for Z.G. and felt that Z.G. was in immediate danger of physical abuse or emotional harm. Collins explained that A.A. exhibited behaviors that made him believe she was suicidal.

According to Collins, A.A. returned to her apartment and locked herself inside with Z.G. A.A. eventually opened the door, and Collins instructed her to step back inside "to keep her from coming back out on the balcony with the child." A.A. vomited into a trash can and Collins came to believe that A.A. had taken pills. Collins contacted emergency medical services and called for backup. According to Collins, A.A. was "lashing around with the child" and almost dropped Z.G. Collins described Z.G. as upset, crying, and "very skinny[.]" Collins testified that Z.G. "was obviously upset and crying hysterically."

Collins explained that he and the officer who responded to the scene, Officer Watkins, were able to calm A.A. down somewhat, and Watkins took Z.G. from

2

A.A. Watkins took the baby to the EMS for treatment, and EMS then went to check on A.A., but A.A. resisted EMS's efforts. Collins testified that A.A. "thrashed around on the floor pretty violently until we could gain control of her. We had to assist EMS in keeping her under control." According to Collins, A.A. continued stating that she had given up on herself and her son and that she wished to go home. Collins explained that based upon his knowledge and training, as well as what he observed, he believed A.A. was suicidal and might harm Z.G..

Collins testified that CPS eventually responded to the scene. Collins explained that he did not see any baby needs, such as bottles, in the apartment. Collins testified that he would not characterize the search of A.A.'s apartment as "thorough," but he did look around the apartment. Collins explained that he opened the cabinets in the kitchen and looked for clothing and diapers for Z.G. According to Collins, there was one container of rice cereal in the apartment, and he found prescription medication on the counters. Collins did not see any illegal drugs. Collins also testified that "there was a mattress on the floor and clothes scattered about. That was pretty much it." A.A. was transported to Fannin Pavilion and placed on a mental health hold because she was found to be a danger to herself or to others. Collins testified that based upon his observations at the scene, he believes that A.A. placed Z.G. in conditions or surroundings that endangered his

3

physical or emotional well-being and engaged in conduct that endangered his well-being. Collins explained that he does not know what caused the incident or what steps A.A. may have taken to remedy the problem.

CPS foster care worker Lynda Porter testified that she has been the caseworker for Z.G. Porter explained that CPS's plan for Z.G. is unrelated adoption, and she stated that Z.G. loves his foster parents and has bonded with them. According to Porter, Z.G. was initially traumatized and did not want to socialize. Porter testified that she developed a plan of service for A.A., and part of the plan was for A.A. to undergo a psychological evaluation. Based upon the results of the psychological evaluation, Porter asked A.A. to do some services, and Porter ultimately determined that it is not in Z.G.'s best interest to be returned to A.A. Porter explained that the plan of service was designed to address the effects that abuse or neglect had upon Z.G.

According to Porter, at the time of trial, A.A. had just found a job, although the CPS case had been pending for ten months, and Porter opined that A.A. did not have stable employment and had not reported for the required drug and alcohol assessment as required by the service plan. Porter explained that the service plan required A.A. to report any lifestyle changes, such as changes in housing or employment status, within seventy-two hours. When asked whether A.A. had

4

maintained contact as required, Porter testified, "[a]t the beginning I would have to initiate the contact. Toward the end of the case, she has been much more communicative with me." According to Porter, A.A. tested positive for drugs "early on in the case," but subsequent drug screens were negative. Porter explained that A.A. had been at the same address since the case began. In addition, Porter testified that she enrolled A.A. in counseling at the beginning of the case, but A.A. did not have her first visit until the case had progressed, and A.A. had only seen the counselor twice. In addition, Porter testified that A.A. canceled numerous scheduled visits with Z.G., and Porter had to go to A.A.'s apartment and convince A.A. that she needed to visit Z.G. Furthermore, Porter testified that A.A. did not successfully complete a parenting class.

Porter testified that A.A. had to stay in jail for five days "to serve out her probation period." Porter also testified that the father of A.A.'s child had died. Porter described A.A. as depressed, and she indicated that during A.A.'s initial visits with Z.G., A.A. did not communicate with Z.G. or distract him, but "she just sat there and held him while he cried." Porter explained that during the last few visits, A.A. had been more interactive with Z.G., but "other than that, . . . she hasn't been able to parent him." Porter opined that Z.G. is likely to be adopted, and that because of A.A.'s mental health diagnoses, A.A.'s difficulties with parenting

5

Z.G. will continue. Porter opined that placing Z.G. with A.A. would endanger Z.G. because A.A. is not mentally stable and capable of caring for a child.

A copy of the February 10, 2015, report by CASA (Court Appointed Special Advocates of Southeast Texas, Inc.) and a copy of psychologist Dr. Robert Meier's psychological evaluation of A.A. were entered into evidence. The CASA reported stated that according to the detective on the scene, A.A. was leaning over the balcony railing with the child and was "admitted on a mental health hold due to her erratic and possibly suicidal behavior." According to the CASA report, A.A. made statements such as "I give up on my baby[,]" "I want to go home[,]" and "we are going to see my mom[,]" even though A.A's mother had been dead for a few years. According to the CASA report, the home was "trashed" and contained no food or clothing for Z.G., and the clothes Z.G. was wearing "were several sizes too small." The report stated that "CASA has serious doubts about [A.A.]'s ability to parent her child."

The psychological evaluation report indicated that A.A. had previously been diagnosed with depression, anxiety, bipolar disorder, and ADHD, and had "attempted suicide and engaged in self-destructive behavior." A.A. "reported several current hallucinations and symptoms of psychosis[,]" and she stated that she sees and hears things that others do not see or hear. According to the

6

psychological evaluation report, A.A. "reports a number of symptoms that may reflect a psychotic process[,]" and her behavior "is likely to be unpredictable and inappropriate[.]" Meier noted in the report that A.A. is "very likely to have suicidal ideation[,]" "feels hopeless[,] and is generally apathetic, so her potential for suicide should be evaluated carefully." The report indicates that Meier diagnosed A.A. with schizophrenia (disorganized type), schizotypal personality disorder, and sleep disorder. According to Meier, A.A.'s "prognosis for a cure with psychiatric or psychological treatment is generally poor[,]" and "[s]ome type of psychopharmacologic intervention will be necessary to stabilize her thought processes and mood and to help her sleep." Meier concluded that A.A. "meets few of the criteria for appropriate parenting[,]" and that A.A. "is likely to have extreme difficulty successfully raising a 19-month-old child by herself."

A.A. testified that on the day she encountered Collins, she took her medication and went outside on the balcony with Z.G., and when she re-entered her home, Collins followed her "and was trying to take [the] baby." A.A. testified that she was upset that morning and she explained that Z.G.'s father had died approximately a year before. A.A. testified that she was under a lot of stress, but she was not going to harm Z.G., and that the statements Collins heard her make were not referring to ending her life or Z.G.'s life. A.A. testified that Z.G. began to

7

cry when Collins was reaching for him, so she initially tried to keep Z.G. from Collins, but she ultimately handed Z.G. over because she "felt something was about to go wrong." A.A. explained that she had a seizure and vomited after she handed Z.G. to Collins. In addition, A.A. testified that she had four cans of milk, two containers of cereal, two jugs of water, and food in the freezer and refrigerator, and she also had diapers and baby wipes. A.A. testified that she had been caring for Z.G. alone for a year at that time, and CPS had never been involved.

According to A.A., she was hospitalized at a behavioral facility after Z.G. was removed, and she was diagnosed as suffering from bipolar disorder and anxiety and given prescription medication. A.A. testified that she has taken her medication as prescribed, and it has helped her. A.A. explained that she has gone through a period of extreme grief, but she believes she can parent Z.G. and provide a safe and loving home for him. A.A. testified that returning Z.G. to her is in Z.G.'s best interest. During cross-examination, A.A. testified that she had been arrested for driving while intoxicated and possession of synthetic marijuana. A.A. also testified that she had pleaded "no contest" to misdemeanor delivery and received deferred adjudication.

The trial court signed a judgment terminating A.A.'s parental rights to Z.G. In its judgment, the trial court found that A.A. knowingly placed or knowingly

8

allowed Z.G. to remain in conditions or surroundings that endangered his physical or emotional well-being, engaged in conduct that endangered Z.G.'s physical or emotional well-being, and failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of Z.G. from the Department's custody. The trial court found that termination is in Z.G.'s best interest and terminated the parent-child relationship between A.A. and Z.G. A.A. appealed.

ISSUES ONE, THREE, AND FOUR

A.A. contends that the evidence is legally and factually insufficient to support the trial court's findings that (1) termination is proper under Texas Family Code section 161.001(1)(D), (E), and (O); and (2) termination is in Z.G.'s best interest. In issue one, A.A. argues the evidence is legally and factually insufficient to support the finding that she failed to comply with the provisions of a court order that specifically established the actions necessary to obtain Z.G.'s return. In issue three, A.A. argues the evidence is legally and factually insufficient to support the trial court's finding that termination is proper under Texas Family Code section 161.001(1)(E), and in issue four, A.A. contends the evidence is legally and factually insufficient to support the trial court's finding that termination is in

9

Z.G.'s best interest. Because issues one, three, and four are dispositive, we address them first.

Under legal sufficiency review, we review all the evidence in the light most favorable to the finding to determine whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could" and we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id*. If no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, the evidence is legally insufficient. *Id*.

Under factual sufficiency review, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id*. We "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. We "consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

10

reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

The decision to terminate parental rights must be supported by clear and convincing evidence, *i.e.*, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In the Interest of J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001 (West 2014); *see also J.L.*, 163 S.W.3d at 84. A judgment will be affirmed if any one of the grounds is legally and factually sufficient and the best interest finding is also legally and factually sufficient. *In the Interest of C.A.C.*, No. 09-10-00477-CV, 2011 Tex. App. LEXIS 3385, at *2 (Tex. App.—Beaumont May 5, 2011, no pet.) (mem. op.). Section 161.001(1)(E) permits termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent engaged in conduct that endangers the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(1)(E). "'[E]ndanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Endanger" means "more than a threat of metaphysical injury or the possible ill

11

effects of a less-than-ideal family environment," but "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id*. Regarding the child's best interest, we consider a non-exhaustive list of factors: (1) desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see* Tex. Fam. Code. Ann. § 263.307(b) (West 2014).

In this case, there was evidence before the trial court that A.A. was upset, crying, screaming, and leaning over a balcony railing with Z.G. in her arms, while stating that she had given up on herself and Z.G. There was also evidence before the trial court that A.A. almost dropped Z.G. In addition, the trial court heard Collins testify that he did not see baby needs, such as bottles and diapers, in A.A.'s apartment, and Collins only found one container of rice cereal. There was also evidence before the trial court that A.A.'s apartment was in disarray, the clothing

12

Z.G. was wearing was several sizes too small, and A.A.'s apartment contained no food or clothing for Z.G. Furthermore, the trial court heard Porter testify that A.A. is mentally unstable and is not capable of caring for Z.G. There was also evidence before the trial court that A.A. was suicidal and exhibited symptoms of psychosis, and the psychologist who evaluated A.A. diagnosed her with schizophrenia and schizotypal personality disorder. Viewing all the evidence in the light most favorable to the finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. Therefore, the evidence is legally sufficient to support the trial court's finding that A.A. engaged in conduct that endangered Z.G.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E). In addition, the disputed evidence is not such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *See J.F.C.*, 96 S.W.3d at 266. We conclude that the evidence is factually sufficient to support the trial court's finding that A.A. engaged in conduct that endangered Z.G.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E). Accordingly, we overrule issue three.

With respect to issue one, the trial court heard evidence that A.A. failed to maintain stable employment during the pendency of the case and did not report for

13

a required drug and alcohol assessment. In addition, the trial court heard evidence that A.A. had tested positive for drugs and had only attended two scheduled counseling sessions during the pendency of the case. The trial court also heard evidence that A.A. had failed to attend numerous scheduled visits with Z.G. during the pendency of the case and did not successfully complete a parenting class. Viewing all the evidence in the light most favorable to the finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *See In re J.F.C.*, 96 S.W.3d at 266. Therefore, the evidence is legally sufficient to support the trial court's finding that A.A. failed to comply with the requirements of a court order that specifically established the actions necessary for her to obtain the return of Z.G. from the Department's custody. *See* Tex. Fam. Code Ann. § 161.001(1)(O). In addition, the disputed evidence is not such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *See J.F.C.*, 96 S.W.3d at 266. We conclude that the evidence is factually sufficient to support the trial court's finding that A.A. failed to comply with the requirements of a court order that specifically established the actions necessary for Z.G. to be returned to her. *See* Tex. Fam. Code Ann. § 161.001(1)(O). We overrule issue one.

14

Regarding the trial court's best interest finding, the record indicates that Z.G. did not consistently have stable employment and had not reported for a required drug and alcohol assessment. The trial court also heard evidence that Z.G. loves his foster parents and has bonded with them. The Department plans for unrelated adoption for Z.G., and Porter testified that Z.G. is likely to be adopted. "[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a) (West 2014). As the sole judge of the witnesses' credibility and the weight to be given their testimony, the trial court could reasonably conclude that termination of A.A.'s parental rights is in Z.G.'s best interest. *See id.* The trial court could reasonably have formed a firm belief or conviction that termination of A.A.'s parental rights was in Z.G.'s best interest, and the disputed evidence is not such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *See id.* §§ 161.001(2), 263.307(b); *see also J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72.

Accordingly, we conclude that the Department established, by clear and convincing evidence, that appellant committed the predicate acts enumerated in section 161.001(1)(E) and (O), and that termination is in Z.G.'s best interest. *See* Tex. Fam. Code Ann. § 161.001. We overrule issue four and need not address issue

two regarding section 161.001(D). *See C.A.C.*, 2011 Tex. App. LEXIS 3385, at *2;

*see also* Tex. R. App. P. 47.1. We affirm the trial court's judgment.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on September 9, 2015
Opinion Delivered November 5, 2015

Before McKeithen, C.J., Kreger and Horton, JJ.